# Case No. 11,581.

## In re RATHBONE.

[3 Ben. 50; 2 N. B. R. 260 (Quarto, 89); 1 Am. Law T. Rep. Bankr. 114; 1 Chi. Leg. News, 107.] [1]

District Court, S. D. New York. Dec., 1868.

BANKRUPTCY—FRAUD — CONCEALMENT OF PROPERTY.

1. Where a bankrupt, who had formerly been a member of a firm engaged in the insurance brokerage business, which was transacted without capital, was taken into the employment of that firm, and continued for some time in that employ, taking a prominent part in the transaction of the business, and then, he being dissatisfied with one of the partners, an agreement was made whereby the bankrupt's wife paid to such partner $4,000, which he had paid for two-tenths of the business, and was herself made a partner in his place, receiving two-tenths of the profits, but not rendering any services, the object of that arrangement being to retain the services of the bankrupt to the firm: *Held*, that, under the circumstances of the case, the arrangement was fraudulent, and the bankrupt was the true owner of the interest in question, which he had fraudulently concealed; and that, therefore, a discharge must be refused to him.

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission. 1 Chi. Leg. News, 107, contains only a partial report.]

2. Fraud is hardly ever made out by direct evidence, but by the interweaving of circumstances.

3. Whether the $4,000 paid by the bankrupt's wife might be reimbursable to her out of the two-tenths of the profits paid to her, quere.

[In the matter of Robert C. Rathbone, a bankrupt.] In this case several specifications of opposition to the bankrupt's discharge had been filed. [Case No. 11,580.] On the hearing, the court held that the eighth specification was made out, but afterwards referred the case back to the register for further testimony [Id. 11,583], and the case now came again before the court on the whole testimony.

J. K. Porter and J. H. White, for bankrupt.

H. P. Herdman, for creditor.

[2] [BLATCHFORD, District Judge. In this case a decision was made by the court on the 5th of May last, sustaining the eighth specification filed in opposition to the discharge of the bankrupt, and refusing a discharge, and overruling the fifth and seventh specifications as not sustained by the evidence. [Case No. 11,583.] All the other specifications had previously been stricken out as not being triable. On the 28th of May, an order was made, on the application of the bankrupt, that the case, so far as regards the fifth, seventh, and eighth specifications, be referred back to the register in charge, for the purpose of enabling the bankrupt to introduce further evidence and proof on his own behalf, and that the opposing creditor be at liberty to introduce further proofs. On the 26th of June an order was made allowing the opposing creditor to file a new specification, averring that the bankrupt wilfully and falsely swore, on his examination before the register, that the money which entered into the purchase of a house and lot in Thirty-First street, New York, and which was bought in the name of Juliet Rathbone, his wife, was contributed by the bankrupt's brother, Aaron H. Rathbone, when in fact such purchase-money or some portion of it was furnished by the bankrupt out of his own means, and that he had an interest in such property; and that said testimony is material under the issues herein; and also allowing the creditor to introduce proof before the register in support of such new specification. A large mass of testimony has been taken before the register and certified to the court under these orders. The greater part of it has reference to the eighth specification. The fifth and seventh specifications and the new specification in regard to the house and lot in Thirty-First street, New York, are, in my judgment, not sustained by the proofs.] [2]

The principal contest between the parties is now, as it was before, in regard to

[2] [From 1 N. B. R. 260 (Quarto, 89).]

the eighth specification, which avers "that the business of Rathbone, Brothers & Co., brokers, &c., in Broadway, New York, was started and built up by said bankrupt, and has so continued under his supervision to the present time, the yearly net profit whereof is now about $35,000; that said bankrupt professes to receive only about one-tenth of the annual profits of said business as a clerk, and in lieu of salary, which amounts to about $3,600 per annum, while his said wife represents by purchase, or pretended purchase, for $4,000, a one-fifth interest in said business, worth about $7,000 per year, all of which business, except those portions actually and not fraudulently sold to others, are assets in the hands of said bankrupt, and should enure to the benefit of his creditors."

The petition in this case, which is a voluntary one, was filed on the 4th of September, 1867. The inventory sets out no assets except personal clothing of the value of $100. The claim on the part of the creditor, under the eighth specification, is, that the bankrupt has concealed and covered up an interest which he had, from the 1st of March, 1866, to the time of filing his petition, as a partner in the firm of Rathbone, Brothers & Co., which did business during that time as insurance brokers in the city of New York. The business of the firm was transacted without any pecuniary capital, and consisted in procuring insurance to be effected on property, for a commission reckoned by a percentage. The success of the business was dependent entirely on the personal exertions of those engaged in it, and there was no buying or selling of any article of traffic, or any user of money or property for hire or profit. The business was established by the bankrupt, in connection with one Hamlin, January 1st, 1855. On the 1st of January, 1856, the bankrupt's brother, Aaron H. Rathbone, joined them. About the 1st of January, 1857, Hamlin withdrew, leaving Aaron H. Rathbone in the business with the bankrupt, under the name of Rathbone Brothers. In 1858, the bankrupt withdrew. In 1861, he became a clerk to Aaron H. Rathbone, in the insurance business, at a salary of $2,500 a year. On the 2d of November, 1863, a copartnership, by written articles, under the name of Rathbone, Brothers & Co., was formed between Aaron H. Rathbone, Henry C. Seward, Theodore H. Knox, and William C. Greig, to do a general insurance brokerage business, and to continue until January 1st, 1868. By the articles, each partner was required to give his diligent and faithful attention for the benefit of the copartnership; and the net profits of the business, after deducting all expenses, were to be divided on the first day of every month, in the proportion of three-tenths to Aaron H. Rathbone, three-tenths to Seward, two-tenths to Knox, and two-tenths to Greig. The bankrupt continued with the new firm, receiving his

salary of $2,500 a year from his brother until January 1st, 1864, and from the firm from the latter date until October 1st, 1864. at which time he left the employment of the firm. On the 1st of March, 1866, he made an arrangement whereby he gave his services to the business of the firm, and received in return therefor one-tenth of the profits of the business, payable monthly. The profits of the business are shown to have averaged $35,000 per year, and it appears that Greig paid $8,000 to Aaron H. Rathbone for his two-tenths interest.

On the 1st of October, 1866, a change was made, out of which the controversy in this matter arises. In order to understand how the change came to be made, it is necessary to examine the evidence as to the position of the bankrupt in connection with the business. Seward, one of the firm, testifies, that while he was in the firm, which was till the 1st of January, 1868, the bankrupt acted as the ostensible business man and head of the concern; that the bankrupt was the most prominent one in the business; that he had more to say in managing the business and hiring clerks, particularly a clerk named Hamlin, who was employed by the influence of the bankrupt, against the wishes of the witness and of Aaron H. Rathbone and Knox, and was accepted by the witness in order to retain the services of the bankrupt; that of the members of the firm, and the attachés of the office, the bankrupt exercised the greatest influence; that Aaron H. Rathbone acted as the solicitor in the business of the firm, and the bankrupt did every thing else that was necessary; that the services of the bankrupt were of more value to the firm than those of any of its members or of any other person in its service; and that, in all business transactions, the bankrupt acted ostensibly as a member of the firm, except in signing some contracts or checks, and wrote letters and signed the firm name without his own name being attached. Henry J. Hopwood, who was a clerk to the firm from September 1st, 1863, till December 31st, 1867, testifies, that while he was in the employ of the firm, the bankrupt acted as the ostensible head of the concern, and all matters were referred to him, and nothing of any importance was done without consulting him. Such was the position of the bankrupt in the business. His compensation of one tenth of the profits, called a salary to him as a clerk, really made him a partner; for there was no risk or liability in the business, and there was nothing in the relations of the four nominal partners to the business, or to each other, or to the bankrupt, which made them any more partners in the business and the firm, by reason of their receiving fixed fractional portions of the profits, than the bankrupt was a partner. He received a fixed fractional portion of the profits. All gave their whole time to the business. In such a business as this was, calling the bankrupt a clerk on a salary was a mere sham. He was a partner, receiving one-tenth of the profits. The four nominal partners divided what was left, in the proportions before named.

This was the condition of things from March, 1866, to October, 1866. The bankrupt knew the value of his services in the business. The witness Seward says, that the bankrupt is as good a fire insurance man as any in the city of New York. It would not be regarded as strange, therefore, if the bankrupt should be found unwilling to continue his relations with the business on the terms of an interest of only one-tenth of the profits. The change made in October, 1866, as evidenced by written papers executed at the time, was this: By an agreement dated October 16th, 1866, executed by Knox and by Juliet Rathbone, the wife of the bankrupt, Knox, in consideration of $4,000 paid to him by Juliet Rathbone, sold to her all his interest in the partnership of Rathbone, Brothers & Co., and in its business and property, and in the benefits to arise therefrom, from the 1st of October, 1866, and agreed that he would not, prior to January 1st, 1868, solicit or receive business or employment, as an insurance broker, from any of the persons or firms for whom the said copartnership then transacted business as insurance brokers, except those named in a written consent, bearing even date therewith, signed by Aaron H. Rathbone, Greig and Seward. By an agreement dated October 16th, 1866, executed by Aaron H. Rathbone, Greig, Seward, and Knox, the first three consented to such transfer to Juliet Rathbone, and released Knox from all obligations and duties as a member of the firm from that date, and accepted Juliet Rathbone as a member of the firm in the place of Knox; and Knox covenanted with them that he would not, prior to January 1st, 1868, solicit or receive business, as an insurance broker, from any persons or firms for whom the said copartnership then transacted business as insurance brokers, except certain ones named, eleven in number; and they covenanted with Knox that they would not, prior to January 1st, 1868, solicit or receive business from those eleven, such agreement to take effect from October 1st. By an agreement dated October 16th, 1866, executed by Aaron H. Rathbone, Greig, Seward, and Juliet Rathbone, it was recited, that Juliet Rathbone had been substituted and accepted as a member of the firm in the place of Knox, but was not required to render any personal service in the business of the firm; and it was mutually agreed that the net profits of the business of the firm from the 1st of October, after deducting all expenses of conducting the same, should be divided on the first day of each month after that date as follows—three-tenths to Aaron H. Rathbone, three-tenths to Seward, two-tenths to Greig, and two-tenths to Juliet Rathbone. It was also provided in that agreement, that, in case of the death of either of the partners

prior to the 1st day of January, 1868, the executors or administrators of the deceased partner should be entitled to the share of profits from time to time which such partner would have been entitled to if living. There was no like provision in the original articles of copartnership of November 2d, 1863. By an agreement dated October 16th, 1866, executed by Rathbone, Brothers & Co., and the bankrupt, it was agreed as follows: "First. Rathbone, Brothers and Company employ said Robert C. Rathbone as their clerk, from the first day of October, 1866, until the termination of their partnership, to wit, the first day of January, 1868, and shall pay him for his services a salary or compensation which shall be equal to one-tenth of the profits of their business, the same to be ascertained and paid on the first day of each month. Second. Robert C. Rathbone shall, during the continuance of said copartnership, devote his entire and faithful attention and services to the business of said copartnership."

What were the reasons which induced the change evidenced by these papers? Seward says: "There were several reasons. Amongst them, there was a difficulty between Gen. Hamlin and Mr. Knox. That and other things led to a serious difficulty between Mr. Robert C. Rathbone and Mr. Knox, and, in order to retain the services of Robert C. Rathbone, it became necessary that Mr. Knox should leave." General Hamlin was a clerk with the firm. Seward, when asked what fact influenced him in desiring Juliet Rathbone to take the interest, she being a woman, who could yield no services, says: "In order to have the services of Robert C. Rathbone." He was asked, what influenced the firm in making the agreement with Juliet Rathbone, in not requiring her to render any personal service in the business of the firm, as he understood it at the time from the rest of the partners. He answered, that it was because it was their interest to do so in keeping the services of Robert C. Rathbone, and that that was the chief object in all their conversations together at the time. He was asked, whether, when Juliet Rathbone was taken in as a member of the firm, any change was made in the compensation which the firm paid Robert C. Rathbone. He answered: "Not directly, but indirectly we gave up one man's services." He was asked: "Did Robert C. Rathbone, after his wife became a partner, render any other, greater or different services from what he did prior to her becoming a partner?" He answered: "I can't say that he did. He might have worked a little more cheerfully, and things did go a little more pleasantly." He was asked: "State how, by giving up one man's services, the firm paid to Robert C. Rathbone a larger compensation than they previously did." He answered: "I stated that they did indirectly, as Mrs. Rathbone received the same interest that Mr. Knox formerly received, without giving her services, and we did not have the

benefit of Mr. Knox's services." The following testimony was then given by the witness Seward, on his cross examination by the counsel for the bankrupt: "Q. Did you personally desire Mr. Knox to leave the firm? A. I did, in order to retain Robert C. Rathbone's services. Q. Was that the sole and only reason? A. No, it was not. Q. State what other reasons prompted you to desire that Mr. Knox should withdraw from the firm. A. To have replaced him by a more active member of the firm. Q. Is that all? A. When the first trouble came up—it was because Mr. Knox didn't attend to his business, and that trouble was between Mr. Knox and Mr. Robert C. Rathbone—and I found I was going to lose Robert's services, I agreed to this new arrangement or partnership. Q. Was you, as a member of the firm at the time, dissatisfied with the manner in which Mr. Knox did his business? A. Yes, sir, there's no doubt about it. Q. Was not that one of the reasons that prompted you to get him out of the firm? A. Yes, sir. Q. How long had you expressed yourself dissatisfied before he did leave? A. I objected to his ever coming as a member of the firm. It was entirely through Mr. Robert C. Rathbone's influence over me that he ever became a member of the firm. Q. You was, then, dissatisfied from the start? A. Yes, sir, from the start of the copartnership, and soon after his coming there as a clerk. Q. Was you pleased when he left the firm? A. In a business point of view I was. Q. You stated that, after Knox left, Robert C. Rathbone received indirectly more for his services than he had previously been receiving. Was this additional compensation paid to him in money? A. I can't answer that, because it is contrary to my answer which the counsel for the bankrupt refers to. Q. Did the firm pay Robert C. Rathbone, directly or indirectly, in money or otherwise, a greater compensation after his wife became a member of the firm, than they did prior to her becoming a member of the firm? A. No, I don't wish to say that the firm paid him any more in money after she became a member of the firm than they did before, but, in explanation of my former answer, which the counsel is criticising, I wish to say we lost one man's services in order to retain Robert C. Rathbone. Q. Was you satisfied to lose the one man's services in order to get him out of the firm? —. No, sir." The effect of this evidence is, that the witness, as a member of the firm, was not satisfied with Knox, and desired to replace him with a more active and attentive person. The bankrupt, too, had trouble with Knox, and would not stay unless Knox were to leave. That was all very well. Why not, then, replace Knox by an active partner and one more active and efficient than Knox? Because the bankrupt interfered and threatened to deprive the firm of his services unless his wife were admitted to take Knox's place, without rendering any services herself, and

without any person being supplied by her, or otherwise, to render, in consideration of her two-tenths share in the profits, the services which had been previously rendered by Knox. She had at her disposal $4,000 of her own money, inherited by her from deceased relatives, which she paid to Knox, and the transaction was consummated. From that time, out of every $100 of profits, the bankrupt first received $10. Of the remaining $90. his wife received $18, Greig $18, Seward $27 and Aaron H. Rathbone $27. Thus the bankrupt and his wife together received $28, out of every $100 of profits—an aggregate larger than that received by any one member of the firm, and one which his services, on the evidence, well deserved, and which the firm yielded rather than lose his services.

Knox testifies, that he paid $4,000 for his two-tenths interest, to Aaron H. Rathbone, on the 1st of January, 1863. He also says, that the bankrupt's one-tenth was paid to him before any distribution of the profits was made among the members of the firm. He also gives this testimony as to the reasons for his sale to Juliet Rathbone: "Q. What induced you to sell out your interest in the firm to Juliet Rathbone? A. There were a variety of reasons. The immediate cause was a disagreement between Robert C. Rathbone and myself, which culminated about three months before I left the firm; but, during that three months. I believe. we did not exchange a word. That, of course, made it unpleasant in our business relations. Then, at the same time, there was a probability of a falling off of business, in consequence of an opposition by insurance companies to brokers, which might tend seriously to damage the business, and I thought I would sell out. I mention that, because it was used as a reason by Mrs. Rathbone why she should not pay a larger sum than she did pay. I do not mean to say that Mrs. Rathbone personally used the expression, but it was the subject of general discussion at the time, that the business was not so valuable as might be considered, in consequence of the anticipated action of the insurance companies, and it had a similar influence on my own mind. Q. Who were the parties to the general discussion you have named? A. Mr. Seward, Mr. Greig and myself. I believe Robert C. Rathbone had no discussion or negotiation with us on the subject." There is nothing in this testimony inconsistent with that given by Seward. It only serves to show how Knox was made use of to accomplish the object of giving to the bankrupt an interest in the firm commensurate with the value of his services. According to the evidence, he brought in clerks whether the partners were satisfied or not, and made and unmade partners as he pleased. He quarrelled Knox out, and forced his wife on the firm under the terms stated, by threatening to leave himself. Hopwood, when asked if he knows through whose immediate influence Knox left the firm, says: "All I know of that is this, that up to about a year and a half ago or two years Mr. Knox and Mr. Robert C. Rathbone were on very intimate terms, but after that they were seemingly not so friendly and Mr. Knox sold out his interest in the firm, but at whose suggestion I don't know."

Greig gives this testimony: "Q. State, if you know, how and why Theodore H. Knox left said firm. A. Because of a disagreement between him and the members of the said firm, which was likely to result in an injury to our business. and. after a negotiation, he then offered to sell out. Not wishing to have any stranger or other person, who might become acquainted with our customers, come into the firm, we preferred him to sell his interest to some one who would become a silent partner and we would do the additional labor ourselves. Mrs. Juliet Rathbone's name was then suggested, and he agreed to sell it to her and we agreed to let him do so, and that was the way in which those papers came to be executed." He also says that the partners thought that Knox did not do his duty; and that he, the witness, did not wish to purchase Knox out, as he did not think there was going to be much if any profit over and above the amount asked for Knox's interest. There is nothing in the testimony of Greig that contradicts the evidence of Seward, that Mrs. Rathbone was brought in because the services of the bankrupt could not otherwise be retained.

The testimony of Seward was given on the 31st of July, and the 1st, and 4th, of August, 1868. The bankrupt was cross-examined on his own behalf on the 11th of August, but he does not any where in his evidence contradict the testimony of Seward, or refer to it in any way, or state how or why Knox left the firm, or why Juliet Rathbone was brought in. Aaron H. Rathbone was examined as a witness as lately as the 13th of October, and is equally silent with the bankrupt. In a case as severely contested as this, and where the point is so vital, the omissions referred to cannot be regarded as accidental or inadvertent.

It is urged on the part of the bankrupt, that the money which Juliet Rathbone paid to Knox was her own money, obtained by inheritance: that the bankrupt never received any portion of the profits on her interest, but they were all paid to her personally from month to month; and that, therefore, her title to the interest she purchased in the firm and to the profits therefrom is unquestionable. The case is sought to be put upon the point, that this was a proper and legitimate investment by her of her own money, and that the share of profits bought by her became her property, as against her husband and his creditors. If there were nothing else but an investment of her money, there would be no difficulty in the matter. But the transaction was devised with great ingenuity and skill, to withhold from the reach of the creditors of the bankrupt the value which the firm are

shown by the evidence to have put upon his services. That value was one-tenth of the profits in the first instance, and then the additional two-tenths. It is clearly shown that they valued the bankrupt's services at the entire three-tenths. Knox paid $4,000 for his two-tenths to Aaron H. Rathbone. In return he was obliged to devote his services to the business of the firm. Mrs. Rathbone reimbursed to Knox his $4,000, and, in return for her two-tenths of the profits, rendered no services to the firm. The bankrupt's services could only be retained by the firm, by their consenting to allow Mrs. Rathbone to receive her two-tenths without her rendering any services. It, therefore, follows logically and inevitably, that those two-tenths represented, in the estimation of the associates of the bankrupt in the firm, the value of his services to the firm, in addition to the one-tenth paid to him directly, and that the two-tenths were paid to her to retain the bankrupt's services and as a compensation for those services, made on the demand of the bankrupt. There was no other possible consideration moving to the firm for the two-tenths. They did not receive any part of the $4,000 which Mrs. Rathbone paid to Knox, nor did they receive any services in place of those of Knox, and they gave up to Knox eleven of their customers. It may be that the $4,000 paid by Mrs. Rathbone to Knox, considered as paid by her at the request of and for the benefit of the firm, in order to enable them to retain the bankrupt's services, may properly be reimbursable to her, with interest, out of the two-tenths of the profits paid to her; but, even if that be so, it cannot affect the true character of the transaction, as making her a trustee of such profits for the creditors of the bankrupt.

The eighth specification is, in my judgment, fully proved, in its entire scope. There was a wilful concealment by the bankrupt of his property derived from the two-tenths profits in the firm, by covering it up in the hands of his wife. The care with which the papers were prepared, including the putting in writing at the time the agreement with the bankrupt respecting his one-tenth, which had, in fact, existed for seven months previously, only serves to show the deliberation with which the scheme was contrived. Fraud is scarcely ever made out by direct evidence. The proof of it is generally arrived at by the interweaving of circumstances, till the fabric is fully formed. It is not often that as full evidence of it is shown as in this case, and yet less full evidence is often entirely satisfactory. The documents and the additional testimony produced on the second reference in this case fully sustain the conclusion of the court on the first hearing and clear up many points that were obscure, and nothing has been shown to induce any modification of any of the views stated in the decision then made by the court.

A discharge is, therefore, refused.